NOT DESIGNATED FOR PUBLICATION

No. 121,913

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.P.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GERALD KUCKELMAN, judge. Opinion filed June 5, 2020. Affirmed.

*Benjamin N. Casad*, of Leavenworth, for appellant natural mother.

*Charles Joseph Osborn*, of Osborn Law Office, LLC, of Leavenworth, for appellant natural father.

*Meredith D. Mazza*, assistant county attorney, and *Todd Thompson*, county attorney, for appellee.

Before STANDRIDGE, P.J., HILL and ATCHESON, JJ.

PER CURIAM:  J.P. (Father) and A.E. (Mother), the natural parents of A.P., separately appeal the ruling of the Leavenworth County District Court terminating their parental rights. Father contends the State failed to present sufficient evidence that he was an unfit parent. Mother alleges the State failed to present sufficient evidence that her unfitness as a parent was unlikely to change in the foreseeable future and the district court abused its discretion in determining that termination was in the best interests of A.P. We find no error in the district court's decisions and affirm.

1

In January 2017, the Kansas Department for Children and Families (DCF) received a report that Mother was admitted to the hospital following a seizure at her home. Mother, who was 26 weeks pregnant, tested positive for amphetamines and was diagnosed with eclampsia, high blood pressure, and polysubstance abuse. Mother delivered A.P. by emergency Cesarean section. A.P. weighed two pounds and five ounces at birth and was considered a high risk for developmental delays due to her prematurity and drug exposure.

On February 15, 2017, the State filed a petition in the district court to have A.P. declared a child in need of care. The court placed A.P. in the temporary custody of DCF upon her release from the hospital. Mother and Father appeared at an adjudication hearing, where they submitted a statement of no contest to the State's petition. The court adjudicated A.P. a child in need of care and ordered A.P. to remain in DCF custody. The court allowed the parents to visit at DCF's discretion and contingent upon passing a drug test.

The district court held a dispositional hearing in April 2017, where it ordered DCF to develop a reintegration plan for each parent. After adopting DCF's proposed reintegration plan, the court held periodic review hearings over the next 18 months to discuss the parents' progress toward completing the tasks set forth in the plan. By December 2018, the district court found that reintegration was no longer a viable option, changed the case plan goal to adoption, and ordered the State to file a motion for termination of parental rights.

On January 4, 2019, the State filed a motion to terminate Mother's and Father's parental rights. After the State made a proffer to the district court regarding Mother's unfitness, the court took the matter under advisement and scheduled a hearing on Father's

unfitness. In May 2019, the district court held a hearing where the State presented evidence relating to the unfitness of both parents. Father did not appear in person because he had entered a 30-day inpatient drug treatment program. As a result, Father's attorney asked the court to either continue the hearing or delay any ruling in the case in order to allow Father to present evidence later after his release from treatment. The district court denied Father's request to continue the hearing and heard testimony from the following witnesses.

*Kim Schroyer*

Kim Schroyer, the DCF investigator assigned to A.P.'s case, testified that she met with Mother for the first time on January 12, 2017. A.P. was still in the hospital at that time and was at risk for developmental delays due to drug exposure. Mother advised that she had not known she was pregnant and that she did not have any baby items other than a car seat. Mother admitted to using drugs since 1995 and that she had a long history of depression. Mother said she was willing to work with DCF and to do whatever was needed to bring A.P. home. Mother was asked to take a RADAC assessment to determine her need for drug treatment and to make an appointment for mental health services. Mother called Schroyer the next day to report that the sheriff's department had served a search warrant at the home she shared with Father and had discovered stolen property and drug paraphernalia.

On February 7, 2017, Schroyer made an unannounced visit to Mother's home and asked her to submit to a urinalysis (UA) test. Mother did not take a test that day. Mother also had not completed her RADAC assessment, or a mental health intake, and had obtained no additional items needed to care for A.P.

Mother and Father both submitted UA tests on February 9, 2017. Mother tested positive for amphetamines and methamphetamines; Father tested positive for marijuana,

amphetamines, and methamphetamines. Schroyer tried to contact Mother and Father on February 13 and 14, but they did not return her phone calls. Schroyer said that although Mother and Father could have stayed with A.P. in the hospital, they did not do so and only visited a few times a week. Mother advised that she could not always get a ride to the hospital and that she did not stay there because all "[A.P.] does is sleep." Although the initial plan was for A.P. to live with Mother and Father after her release from the hospital, Schroyer ultimately requested that A.P. be placed in protective custody due to the parents' lack of follow through with submitting UAs and obtaining items to take care of A.P.

*Dustin Shandy*

Dustin Shandy, a social worker with KVC Behavioral Healthcare, Inc. (KVC), testified that she was A.P.'s case manager from August 2017 to May 2018. Shandy said that the district court had approved a reintegration plan for the parents in May 2017, and the target date for completion of that plan was November 2017. Shandy advised that during her time on the case, the parents' progress was "hit or miss." Shandy testified that she regularly communicated with Mother in person or by phone but had limited communication with Father. Shandy said that she held four case plan meetings to review the parents' progress toward reintegration and explain what tasks they still needed to complete. Mother attended all the meetings, either in person or by phone. Father attended two of the meetings.

Shandy testified that as part of the reintegration plan, Mother and Father were required to complete a parenting class. Mother completed the class but did not provide verification that she had done so. Father did not complete the class.

Another case plan requirement was to participate in visits with A.P. Shandy testified that Mother's visitation was "on and off." Mother had consistent visits with A.P.

4

between October and December 2017. Mother's two-hour weekly visits were initially supervised by KVC. By December 2017, Mother's visitation had increased and was being supervised by Mother's mother. Shandy observed some of Mother's visits and did not have any concerns. But Mother's visits with A.P. were suspended in late December 2017 or early January 2018 after Mother tested positive for methamphetamine and amphetamines. Mother's visitation later resumed after she submitted two negative drug tests, but Mother only had five visits with A.P. over the next five months. Shandy did not notice any effect on A.P. when Mother's visits became inconsistent.

Shandy testified that Father had some visitation prior to her involvement in the case. But during Shandy's time as case manager, Father never visited A.P. by himself and only came with Mother "a handful of times" when he was allowed to do so after submitting a negative UA test result. Before one of Father's visits, Shandy talked to him about his drug use and explained that he could have more visits with A.P. if he stopped using drugs. Father said little in response and rarely participated in the visits with A.P.

Mother and Father were required to submit to two drug tests per week. During Shandy's involvement in the case, Mother did not show up for 60 of the tests and had 13 positive tests. Mother also had nine invalid tests, meaning that she could not or would not provide enough of a urine sample to test or that the temperature or color of the sample was inconsistent with urine from Mother. Father did not show up for 106 tests. Father was incarcerated during some of the time that he missed tests, but it is unclear from the record how long he was incarcerated. Father had five positive tests and six invalid tests. Shandy had concerns that Mother and Father were not submitting their own urine for the tests, and Mother and Father both refused to submit to mouth swabs when their UA tests provided invalid results. Shandy said that she was flexible in allowing Mother and Father to change their UA test schedule when they could not come to the office for testing, but she felt that they abused that privilege. Shandy spoke with Mother about the likely consequences of continued drug use on her ability to function as a parent. Shandy did not

5

know if Mother understood that her continued drug use could lead to the termination of her parental rights. According to Shandy, Mother denied that she had a problem and did not seem to recognize that her drug use was causing any problems. Shandy said that many of her conversations with Mother ended with Mother yelling and becoming angry.

Mother and Father were required to maintain employment. When Shandy began working on A.P.'s case, neither Mother nor Father was employed. Shandy said that both parents were employed at a temp agency sometime during February and March 2018, but they were fired in March 2018. Mother asked Shandy to have her UA testing schedule changed for work, but Shandy later learned that Mother and Father had been fired from their jobs the week before. Despite Shandy's repeated requests, neither Mother nor Father ever provided her with any pay stubs or other verification of their employment during the 18 months they said they were working to achieve the goals in the case plan.

Another case plan task was to complete a RADAC assessment and follow the recommendations. Both Mother and Father completed an assessment, but Mother did not follow the recommendation for completing outpatient treatment. Mother attended some classes but was discharged for nonattendance, and she continued to test positive for methamphetamine. Father's assessment recommended inpatient treatment. He began inpatient treatment in March 2017 but did not complete it. Thereafter, Father either continued to test positive for drugs or did not show up for testing.

Mother and Father also were required to complete an intake at The Guidance Center and seek out mental health services as recommended. Mother completed her intake in March 2017 but only attended therapy "a handful of times." Shandy had no record of Father ever completing an intake.

Mother and Father were required to obtain appropriate housing and provide proof of residency to KVC. Shandy testified that Mother and Father had housing when she took

6

over the case, but she was never able to schedule a walk-through of the house to determine whether it was appropriate for A.P. When Shandy made an unannounced visit to the house in January 2018, Mother's car was there but no one came to the door.

*Regina Angandja*

KVC social worker Regina Angandja testified that she had been A.P.'s case manager since June 2018. When she took over the case, Angandja contacted Mother but did not have any contact with Father for several months. Mother and Father attended two case plan meetings by phone to review the tasks necessary for reintegration. Angandja discussed with the parents that reintegration might not be viable if they did not complete the reintegration plan. Along with the case plan meetings, Mother and Father also had a chance to attend monthly meetings to review tasks and the reintegration plan. Mother attended several meetings from June to November 2018, but Father attended only one meeting. At the time of the May 2019 termination hearing, Angandja had not been in contact with Father since January 2019 or Mother since February 2019. Angandja acknowledged that Father was incarcerated during at least part of the time she was the case manager.

Angandja testified about the parents' lack of progress on the case plan tasks. Angandja testified that Mother and Father had lived in the same house throughout the case and both of them understood that she would need to do a walk-through before visitation could occur there. Angandja said that during her time as case manager, she made monthly attempts to set up a home study to determine whether Mother and Father's house was safe and stable, but Mother never responded.

Angandja testified that Mother and Father had reported employment at temporary agencies at various times throughout the case. Father only provided two pay stubs from April 2017, and Mother did not provide any proof of her employment.

7

Angandja said that Mother and Father had completed RADAC assessments but were not actively following the recommendations. Mother had participated in some treatment sessions but was unsuccessfully discharged from the program in June 2018 and had never provided verification that she ever returned to treatment. According to Angandja, Father had gone to inpatient treatment five times. Angandja last spoke to Father in January 2019 upon his release from inpatient treatment. At that time, Father submitted a negative UA result. But Father submitted another UA later that month that tested positive for methamphetamine. Angandja testified that as of May 2019, Mother and Father had been asked to take 152 UA tests. Mother did not show up for at least 73 of these tests and had 14 positive tests, 56 negative tests, and 9 invalid tests. Mother did not take any UA tests from January to April 2019. She tested positive for methamphetamine on April 22, 2019, when the court ordered her to take a test at the termination hearing. Angandja testified that she discussed with Mother the impact her drug use could have on her ability to successfully reintegrate with A.P. Rather than acknowledge that she should change her behavior or actions, Mother instead blamed KVC and the nurses at the hospital. Of the 152 UA tests Father was supposed to take, he did not show up for 120 of them. Father had 5 positive tests, 21 negative tests, and 6 invalid tests. Father had last submitted a UA in January 2019.

Angandja testified that the parents were scheduled to have one-hour weekly visitation with A.P. As of May 1, 2019, Mother and Father had been eligible for 101 visits. Mother attended 20 visits and Father attended 4. Neither parent had visited A.P. since January 2019 because they had not complied with their UA requirements.

Angandja testified that Mother and Father both failed to make progress toward the case plan requirement of seeking out mental health services. Due to Mother's history of mental health issues, Angandja felt it was important for Mother to seek out services. Mother reported to Angandja that she was attending monthly meetings beginning in March 2018 but never provided any documentation of her attendance at these meetings.

8

Angandja later learned that Mother had completed an intake but never went to any meetings, so she was discharged from the program in June 2018. Father only provided verbal assurance that he had completed a mental health intake.

Angandja testified that KVC tried to help the parents make progress toward reintegration. Angandja reported 13 occasions in which she rescheduled their UA tests or changed the testing location at the parents' request. Angandja also provided the parents with gas cards after Mother reported car trouble. Mother and Father were initially required to submit to testing twice a week. Because of their transportation issues, Angandja allowed them to come in only once a week beginning in January 2019. Rather than make progress on this task, Mother and Father stopped submitting UAs altogether.

Angandja testified that A.P. had been in the same licensed foster home in Lansing since her release from the hospital. Angandja said that A.P. was doing well, had bonded with her foster family, and had no developmental issues. According to Angandja, A.P.'s bond with Mother and Father was like that of a stranger.

*Mother*

Mother testified about her progress on the case plan tasks, including her completion of parenting classes. Mother admitted that she had tested positive for methamphetamine at the time of A.P.'s birth but noted that A.P. had not. Mother claimed that after A.P.'s birth, she called the hospital or tried to visit A.P. every day. Mother said that she wanted to keep working on her reintegration plan and wanted A.P. in her home. Mother said that she and Father had lived in the same house for the previous four and a half years. Mother claimed the residence was appropriate for A.P. and denied that KVC had ever contacted her to schedule a walk-through. Mother said she and Father had been working off and on at a temporary agency throughout the case.

Mother acknowledged that she started using drugs in 1995 but denied that she had been using continuously since that time. She claimed she had relapsed only in the last couple of years. Mother said that she had never sought drug treatment before this case. Mother testified that she had been complying with the RADAC recommendations by participating in outpatient treatment "off and on." Mother admitted that she did not engage in mental health or substance abuse treatment from September 2018 to May 2019 and that she was using methamphetamine during that time. Mother said she had returned to treatment in May 2019, attending an individual therapy appointment and two classes for relapse prevention. Mother advised that she intended to continue this treatment and would submit to inpatient treatment if required. But Mother did not agree that any additional treatment would be helpful. Mother expressed confidence that she could stop using drugs.

Mother testified that she had not contacted her case manager or seen A.P. since January 2019. Mother claimed that her visits had been suspended due to the pending termination hearing and not because of her failure to submit negative UA results. Mother acknowledged that she needed to stay clean to see A.P. and that she had not been able to do so. Mother agreed that law enforcement had found a meth pipe in her house but denied knowing who it belonged to or that it belonged to her. Mother admitted that she had used methamphetamine right before A.P. was born and that she had used the drug before the April 2019 court hearing because she was anxious. Despite these admissions, Mother denied that she ever had a problem with methamphetamine.

After considering the evidence outlined above and hearing oral argument from the parties, the district court found by clear and convincing evidence that Mother and Father were unfit by reason of conduct or condition which rendered them unable to properly care for A.P. and that the conduct or condition was unlikely to change in the foreseeable future. The district court also considered the physical, mental, and emotional health of

A.P., and determined that termination of parental rights was in A.P.'s best interests. Mother and Father filed this timely appeal.

STANDARD OF REVIEW

We begin with the legal standards that govern our review. In this case, the district court made two separate decisions that we must review. First, the district court made two findings related to Mother's and Father's fitness as parents—that Mother and Father were unfit for specific factual reasons and that their unfitness was unlikely to change in the foreseeable future. Those findings allowed the court to consider whether to terminate Mother's and Father's rights to their children. Second, the district court found that terminating Mother's and Father's parental rights was in their child's best interests.

Our standard for reviewing the first decision—the district court's conclusions on parental fitness—is well established. The district court may make the fitness findings based only on clear and convincing evidence, K.S.A. 2019 Supp. 38-2269(a), so we must determine on appeal whether clear and convincing evidence supports the district court's findings. To do so, we determine whether the evidence, taken in the light most favorable to the State, could have convinced a rational fact-finder that these facts were highly probable. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In short, any conflicts in evidence must be resolved to the State's benefit.

The second decision—whether termination of parental rights is in the best interests of the child—is a discretionary judgment call for the district court. *In re R.S.*, 50 Kan. App. 2d 1105, 1114-15, 336 P.3d 903 (2014). Because it is within the sound discretion of the district court, an appellate court reviews this decision for an abuse of discretion. See 50 Kan. App. 2d at 1116. A district court exceeds that broad latitude if it rules in a way

11

no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representation, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

THE DISTRICT COURT'S DECISION

After considering the evidence presented and the testimony of the witnesses at the May 29, 2019, termination hearing, the district court made the following ruling from the bench:

"THE COURT: Okay. All right. First of all, I would find that this Court has jurisdiction over the child and the subject matter. Further find that venue is proper here in Leavenworth County.

"I've sat here and listened to the testimony today. You know, this child is just a little bit over two years of age and has spent its entire life—well, it was in the hospital for about a month and then it went into custody and has been in custody since that time. The parents have not exercised their parenting since this child's . . . birth. . . .

"The opportunities that the parents have had, they have not taken on. They had— beginning with the hospital, they had plenty of opportunity to spend time with the child . . . while the child was hospitalized, but the evidence shows that they failed to do that. Likewise, once the child was released from the hospital, they've had plenty of opportunities to visit the child and have not been able to have consistent visitation.

"While I would agree that drug usage is very difficult to beat, particularly methamphetamine, these parents have failed to set aside the drugs for the good of their child. Many people go into drug treatment programs and they have relapses and have to go back. And, in this case, the father has been—maybe it's three, maybe it's five, whatever it is, over the two-year history of this case, he's had continuous drug usage, just been unable to beat it. And—and maybe he'll never beat it, I don't know. But there's been ample opportunity, if he's been in five treatment programs, he's certainly been given

12

plenty of opportunity to get through this drug addiction so that he can go be a father to this child.

"Likewise, I would say that the mother's had a lot opportunity. I'm looking at The Guidance Center report, and I note that there are 26 of her group sessions she failed to even show up for. You know, if she was going once a week, that would be, in a year's time, that'd be every other week she's failing to show up. So whether it's because her car doesn't run or whether she doesn't have a ride or whether she was just high and didn't wanna go, I don't know.

. . . .

"THE COURT: I don't know why she wasn't there. But the op—my point is, the opportunities have been there for the parents to change their conduct, they've had ample opportunity, and they've failed to do so. Frankly, the testimony of the social workers indicates that KVC and DCF tried very hard . . . to accommodate these parents, and the parents have totally failed. When the parents will not submit to a saliva test 'cause they don't believe they can generate enough survi—saliva, that's indication to me that they don't wanna take the test. They don't have enough urine for a UA; not enough saliva for the mouth swabs. They simply are not wanting to take the test.

"So as you go through the reintegration plan, this reintegration plan's been on file for over a year now. Really, none of the tasks have been completed. I guess, perhaps, they have a residence. . . . But, yet again, the social workers have been unable to go in and see if it's an acceptable . . . residence so . . . .

"While there's been a little effort by the parents, there's not nearly enough. This young child needs stability, and so it's time for the child to get on with its life. So at this time I would find that the parents are unfit for the following reasons: failure to reason—failure of reasonable efforts made by appropriate public and private agencies to rehabilitate the family; lack of effort on the part of the parent to adjust the parents' circumstances, conduct or condition to meet the needs of the child. Also, there's a failure to carry out a reasonable plan, approved by the court, directed towards the reintegration of the child into the parental home; and, additionally, the parents have failed to maintain regular visitation, conduct—contact or communication with the child or the custodian of the child.

"The parents of the child should be presumed to be unfit by reason of conduct or condition that renders the parents unable to fully care for the child due to the following reasons: The child has been in an out-of-home placement, under court order for a

13

cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed towards reintegration of the child into the parental home as set forth in K.S.A. 38-2271 subsection (a)(5).

"And the child has been in an out-of-home placement, under court order for a cumulative total period of two years or longer; the parent has failed to carry out a reasonable plan, approved by the court, directed towards reintegration of the child into the parental home; and there is a substantial probability that the parents will not carry out such a plan in the near future under K.S.A. 38-2271(a)(6).

"Pursuant to K.S.A. 60-414 subsection (a), the facts from which the presumption is derived do have probative value as to evidence of the existence of the presumed fact; therefore, the presumption should continue to exist and the burden of establishing the nonexistence of the presumed fact is upon the party against whom the presumption operates. In this case, the fa—parents have failed to rebut that presumption.

"In light of the duration of the unfitness, the chronic nature of the parental shortcomings in spite of numerous state and private services, the unfitness of the parents is unlikely to change in the foreseeable future. Termination of parental rights, in this case, is in the best interest of this child. The parental rights of both the mother and father are hereby terminated at this time."

Later that day, the court filed a journal entry memorializing its ruling. This journal entry stated as follows:

"THE COURT FINDS:

"1. The evidence is clear and convincing that the X **mother** . . . X **father** . . . of the child named above is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future. The finding is based on the following facts:

Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family {K.S.A. 38-2269(b) (7)};

14

Lack of effort on the part of the parent to adjust the parent's circumstances, conduct or condition to meet the needs of the child {K.S.A. 38-2269(b) (8)};

Failure to carry out a reasonable plan approved by the court directed toward the integration of the child into the parental home {K.S.A. 38-2269(c) (3)};

Failure to maintain regular visitation, contact or communication with the child or with the custodian of the child; {K.S.A. 38-2269(c) (2)};

"2. X Considering the physical, mental or emotional health of the child, termination of parental rights is in the best interests of the child named above and the physical, mental or emotional needs of the child would best be served by termination of parental rights. The parental rights of [**Mother and Father**] should be terminated.

. . . .

"3. THE COURT FURTHER FINDS the parents should be presumed to be unfit for the following reasons:

The child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home {K.S.A. § 38-2271(a)(5)}

(A) the child has been in an out-of-home placement, under court order for a cumulative total period of two years or longer; (B) the parent has failed to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home; and (C) there is a substantial probability that the parent will not carry out such plan in the near future; {K.S.A. § 38-2271(a)(6)}

The Court finds that the presumption of unfitness is a presumption that arises under K.S.A. 60-414(a). The Court further finds that [Mother], natural mother and [Father], natural father, have not rebutted the presumption of unfitness by a preponderance of evidence.

"IT IS THEREFORE ORDERED:

"X The parental rights to the child named above of the following persons are terminated:
**[Mother], natural mother**
**[Father], natural father**[.]"

Conspicuously missing from the district court's ruling from the bench and its journal entry are the specific findings of fact, drawn from the evidence presented to the court, that formed the basis for each of the court's conclusions of law. Supreme Court Rule 165 (2020 Kan. S. Ct. R. 215) places a duty on the district court to provide adequate findings of fact and conclusions of law on the record to support its decision:

"(a) **Court Must State Findings of Fact and Conclusions of Law.** In a contested matter submitted to the court without a jury—and when the court grants a motion for summary judgment—the court must state its findings of fact and conclusions of law in compliance with K.S.A. 60-252."

In turn, K.S.A. 2019 Supp. 60-252 provides:

"(a) *Findings and conclusions*. (1) *In general*. In an action tried on the facts without a jury or with an advisory jury or upon entering summary judgment, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of evidence, or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under K.S.A. 60-258, and amendments thereto."

There is no question here that the journal entry filed by the district court did not comply with the above rule. And, although the transcript reflects that the court stated some findings on the record after the close of evidence, those findings were severely

16

limited in number and more accurately can be described as narrative rather than factual in nature.

But Father and Mother did not raise this issue at the district court level. And a litigant must object to inadequate findings of fact and conclusions of law at the trial level so as to give the district court an opportunity to correct them. Without such an objection, an appellate court may presume the district court found all the facts necessary to support the judgment. *In re Guardianship of B.H.*, 309 Kan. 1097, 1107-08, 442 P.3d 457 (2019). The Supreme Court's rule—as set forth in its cases—directing us to presume the district court found all the facts necessary to support the judgment appears to conflict with Supreme Court Rule 165 placing a duty on the district court to provide adequate findings of fact and conclusions of law to support its decision. But the two rules can be reconciled, as reflected by the court's decision in *Burch v. Dodge*, 4 Kan. App. 2d 503, Syl. ¶ 3, 608 P.2d 1032 (1980):

> "The requirements of K.S.A. 60-252 and Supreme Court Rule No. 165 (225 Kan. lxxii) are in part for benefit of the appellate courts in facilitating appellate review; and when the record on review will not support a presumption that the trial court found all the facts necessary to support the judgment, the case will be remanded for additional findings and conclusions even though none of the parties objected either in the trial court or in this court."

While it is unfortunate that the district court failed to state the specific findings of fact, drawn from the evidence presented to the court, that formed the basis for its legal conclusions as required by K.S.A. 2019 Supp. 60-252 and Supreme Court Rule 165, we have thoroughly reviewed the record and find it supports the presumption that the district court made the necessary findings to support its judgment. *In re Interest of Lett*, 7 Kan. App. 2d 329, 332, 640 P.2d 1294 (1982); *Burch*, 4 Kan. App. 2d at 507. Of course, the better practice dictates compliance with statutory and Supreme Court rules requiring the district court to "find the facts specially and state its conclusions of law separately" after

the close of evidence or in a journal entry. See K.S.A. 2019 Supp. 60-252; Supreme Court Rule 165.

ANALYSIS

1. *Unfitness*

K.S.A. 2019 Supp. 38-2269(b) contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. The statute also lists four other factors to be considered if a parent no longer has physical custody of a child. See K.S.A. 2019 Supp. 38-2269(c). In addition, the district court may rely on one or more of the statutory presumptions set out in K.S.A. 2019 Supp. 38-2271(a) to find a parent unfit. Any one of these factors may, but does not necessarily, establish grounds for termination of parental rights. See K.S.A. 2019 Supp. 38-2269(f).

As noted above, the district court found Mother and Father unfit under six statutory factors. Father contends the district court erred in finding him unfit, disputing each of the statutory grounds relied on by the court. Mother does not specifically challenge the district court's finding of unfitness; instead, Mother focuses her arguments on the court's finding that her unfitness was unlikely to change in the foreseeable future.

a. *Father's unfitness*

(1) *Failure of reasonable efforts to rehabilitate the family*

The language in K.S.A. 2019 Supp. 38-2269(b)(7) imposes an obligation upon the relevant social service agencies to expend reasonable efforts toward reintegrating the child with his or her parents. To that end, the social service agencies should attempt to help the parent accomplish case objectives designed to correct the parent's conduct or condition that caused removal of the child from the home. The purpose of the reasonable

18

efforts requirement is to provide a parent with the opportunity to succeed, but to do so the parent must exert some effort. *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 (2019). Agencies are "'not required to exhaust any and all resources to rehabilitate a parent,' and proof of 'a herculean effort to lead the parent through the responsibilities of the reintegration plan' is not required." *In re S.C.*, No. 107,950, 2012 WL 5392188, at *3 (Kan. App. 2012) (unpublished opinion); see *In re M.S.*, 56 Kan. App. 2d at 1257 (holding that only reasonable efforts are required, not effective efforts).

Here, the record is replete with examples of KVC's reintegration efforts and management of Father's case plan tasks, which included holding monthly meetings, texting reminders for meetings and court dates, rescheduling dates and changing locations for drug screens and visitation, offering gas cards and other assistance with transportation issues, reducing the frequency of Father's UA tests, and allowing Father to submit mouth swabs instead of urine samples. Despite these efforts, Father made little, if any, progress toward reintegration. He rarely participated in case plan meetings and was hardly in contact with the case managers. Due to Father's failure to submit to or provide negative UAs, Father only had four to six visits with A.P. in the two years that the case was pending.

Father concedes that his ongoing struggle with drug addiction delayed the rehabilitation of his family. But Father argues that he was making a "sustained and serious effort" to remain sober and complete the case plan tasks necessary to regain custody of A.P. Father notes that he completed RADAC assessments and multiple rounds of inpatient treatment, in addition to providing a livable home for A.P.

It is true that Father completed RADAC assessments and followed the inpatient treatment recommendations, but Father's inability to remain sober after each round of treatment necessitated his continued return. Father's many cycles of inpatient treatment are hardly proof of progress on the reintegration plan. He tested positive for

methamphetamine in January 2019, shortly after his most recent release from inpatient treatment and after being served with a motion to terminate his parental rights. Notably, Father could not attend the termination hearing because he was in treatment. And Father's claim that he had provided a livable home for A.P. is contrary to the record. The case managers testified that they were never able to schedule a walk-through of the parents' home in order to verify that the home was safe for A.P.

Upon review of the evidentiary record, viewed in the light most favorable to the State, a reasonable fact-finder could find it highly probable that reasonable efforts by appropriate agencies had been unable to rehabilitate the family. We find sufficient evidence to support the district court's holding that Father was unfit under K.S.A. 2019 Supp. 38-2269(b)(7).

(2) *Lack of sufficient effort to adjust to meet the child's needs*

In finding unfitness, the court may consider the lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child. K.S.A. 2019 Supp. 38-2269(b)(8). Father argues there is considerable evidence of his efforts to adjust his circumstances to be a successful parent and member of society. Father notes that he completed multiple drug treatment programs successfully, he passed most of the UA tests he could take, and he maintained at least semi-regular employment throughout the duration of the case.

Father's argument is unpersuasive. As discussed, Father's completion of multiple rounds of inpatient drug treatment does not qualify as a successful effort to adjust his circumstances. This treatment did not stop Father from continuing to use drugs upon his release from each cycle of treatment, even after learning his parental rights could be terminated. And Father's claim that he passed most of the UA tests that he took is misleading and ignores the reality that he did not show up for 120 of the 152 UA tests

20

that he was supposed to take. Finally, no evidence supports Father's assertion that he maintained employment, semi-regular or otherwise, throughout the case. Mother testified that Father worked at a temporary agency "[o]ff and on," but Angandja testified that Father only provided two pay stubs in April 2017 and presented no other proof of his employment during the two years the case was ongoing.

Upon review of the evidentiary record, viewed in the light most favorable to the State, a reasonable fact-finder could find it highly probable that Father had not made sufficient effort to adjust his circumstances to meet the needs of A.P. We find sufficient evidence to support the district court's holding that Father was unfit under K.S.A. 2019 Supp. 38-2269(b)(8).

### (3) Failure to maintain regular visitation, contact, or communication with the child or the child's custodians

When a child is not in the physical custody of the parent, in finding unfitness, the court may also consider the failure to maintain regular visitation, contact, or communication with the child or with the custodian of the child. K.S.A. 2019 Supp. 38-2269(c)(2). Father suggests that the weight of the evidence showed that he was in regular contact with Mother and A.P. Father agrees that his efforts may have been hampered by his drug addiction but claims that he did everything in his power to remain in A.P.'s life.

If Father had complied with his case plan and stayed in contact with his case manager during the two years the case was pending, he would have been eligible for 101 visits with A.P. Father only visited A.P. four to six times. And at the time of the May 2019 termination hearing, Father had last visited A.P. in January 2019. There is no question that Father had minimal contact with A.P. throughout the case. Father also failed to maintain regular contact with A.P.'s case managers, who were considered her custodians. Shandy testified that she did not see Father often, and Angandja did not have

21

contact with Father for several months after she took over the case in June 2018. Angandja had last heard from Father in January 2019, four months before the termination hearing.

Upon review of the evidentiary record, viewed in the light most favorable to the State, a reasonable fact-finder could find it highly probable that Father failed to maintain regular visitation, contact, or communication with A.P. or her custodians while she was not in his physical custody. We find sufficient evidence to support the district court's holding that Father was unfit under K.S.A. 2019 Supp. 38-2269(c)(2).

(4) *Failure to carry out a reasonable court-approved plan*

When a child is not in the physical custody of the parent, in finding unfitness, the court may also consider the failure to carry out a reasonable plan approved by the court directed toward integrating the child into the parental home. K.S.A. 2019 Supp. 38-2269(c)(3).

The district court adopted the parents' reintegration plan on May 11, 2017. In relevant part, the case plan tasks required Father to complete a parenting class, obtain employment and provide pay stubs to KVC, complete a RADAC assessment and follow recommendations, submit to random drug and alcohol tests and provide negative results, complete a mental health intake and seek out recommended services, participate in visits with A.P., and obtain appropriate housing. The target date for completion of the reintegration plan was November 2017.

Father argues that the case plan was gradually progressing toward reintegration and that he and Mother were making "substantial progress" on case plan tasks, including completing RADAC assessments, submitting to drug screens, maintaining employment, and participating in visitation with A.P. Father acknowledges there were setbacks and

22

difficulties, but claims he repeatedly demonstrated his commitment to reintegration throughout the case.

We are unpersuaded by Father's arguments. Although Father completed two RADAC assessments, he failed to follow through with the recommendation of the second assessment for at least 10 months. Father completed inpatient treatment multiple times throughout the case but continued to use drugs each time he was released. Father most recently completed inpatient treatment in January 2019 and tested positive for methamphetamine later that month and was back in treatment at the time of the termination hearing. Father missed 120 of the drug tests he was asked to take. Of the 32 tests Father did submit, he provided 5 positive tests and had 6 invalid tests. Father's case manager was concerned that he was not submitting his own urine. And when Father was given the option to submit a mouth swab instead, he refused to do so. Given Father's failure to participate in drug testing or submit negative results on a regular basis, he was unable to maintain any consistent visitation with A.P. As discussed, Father participated in only 4 to 6 of the 101 visits he would have been eligible for had he complied with the drug testing requirements. Father had not seen A.P. for four months before the termination hearing. And the only evidence that Father had maintained employment was two pay stubs from April 2017. Moreover, Father's argument that he was making substantial progress toward reintegration also ignores his failure to provide proof of appropriate housing or provide documentation that he had completed a parenting class or a mental health intake.

Upon review of the evidentiary record, viewed in the light most favorable to the State, a reasonable fact-finder could find it highly probable that Father failed to carry out a reasonable, court-approved plan aimed at reintegrating the family while A.P. was not in his physical custody. We find sufficient evidence to support the district court's holding that Father was unfit under K.S.A. 2019 Supp. 38-2269(c)(3).

23

*(5) Presumptions of unfitness*

Under K.S.A. 2019 Supp. 38-2271(a)(5) and (a)(6), a parent will be presumed unfit if the State establishes by clear and convincing evidence either that (1) the child has been in an out-of-home placement under court order for a cumulative total period of at least one year and "the parent has substantially neglected or willfully refused to carry out" a reasonable court approved parenting plan or (2) the child has been in an out-of-home placement under court order for a cumulative total period of at least two years and "the parent has failed to carry out" a reasonable court approved parenting plan and there exists a "substantial probability that the parent will not carry out such plan in the near future." K.S.A. 2019 Supp. 38-2271(a)(5) and (a)(6). If either presumption applies, "[t]he burden of proof is on the parent to rebut the presumption of unfitness by a preponderance of the evidence." K.S.A. 2019 Supp. 38-2271(b).

Father concedes the length of time A.P. has been in an out-of-home placement but challenges the district court's determination that he substantially neglected or willfully refused to carry out the reintegration plan. Father also disputes the court's finding that there was a substantial probability he would not carry out the plan in the near future. Father admits he struggled to complete some tasks but claims he consistently tried to improve his situation by participating in visits with A.P., completing multiple rounds of inpatient drug treatment, submitting negative UA results, and maintaining some level of employment throughout the case.

A district court may look to a parent's past conduct as an indicator of future behavior. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982); *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App. 2015) (unpublished opinion). Father's history, as detailed above, shows a pattern of almost complete noncompliance with his reintegration plan. The case managers reported that they had little contact with Father throughout the two-year duration of the case. Father completed inpatient treatment

24

multiple times throughout the case but continued to use drugs each time he was released, even after learning his parental rights could be terminated. Father missed 120 of the 152 drug tests he was asked to take. Of the 32 tests Father did submit, he provided 5 positive test results and had 6 invalid tests. Father visited A.P. four to six times in two years. At the time of the termination hearing in May 2019, Father had not had contact with A.P. or the case managers since January 2019. Father's only verified employment during the case occurred in April 2017.

The evidence presented at the hearing established that Father failed to do most of the case plan tasks required by the reintegration plan and was not participating with the reintegration plan at the time of the termination hearing. Nothing in Father's history supports a finding that he would succeed in carrying out the reintegration plan in the near future. Notably, Father did not attend the termination hearing or present any evidence to rebut the presumptions of unfitness set forth in K.S.A. 2019 Supp. 38-2271(a)(5) and (a)(6).

Upon review of the evidentiary record, viewed in the light most favorable to the State, a reasonable fact-finder could find it highly probable that while A.P. was outside his physical custody, Father substantially neglected or willfully refused to carry out the reintegration plan and that there was a substantial probability he would not carry out the plan in the near future. We find sufficient evidence to support the district court's holding that Father was presumptively unfit under K.S.A. 2019 Supp. 38-2271(a)(5) and (a)(6).

b. *Mother's unfitness unlikely to change in the foreseeable future*

Turning to Mother's arguments on appeal, she first challenges the district court's finding that her unfitness was unlikely to change in the foreseeable future.

We examine the "foreseeable future" from the perspective of a child. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Children and adults have different perceptions of time, and a child has the right to permanency within a time frame that is reasonable to them. 50 Kan. App. 2d at 1170; see *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's"). At the time of the termination hearing, A.P. was 2 years old and the case had been pending her entire life.

Claiming the district court never made a finding that reintegration was no longer viable prior to the termination hearing, Mother asserts that her engagement with the reintegration process was increasing. For support, Mother cites her testimony that (1) she and Father had a stable place to live, (2) she had obtained at least two different drug and alcohol evaluations and had recently started outpatient drug treatment, (3) she had maintained employment, (4) she had completed parenting classes, and (5) she had submitted numerous negative UA test results.

Contrary to Mother's assertion, the district court did make a finding that reintegration was no longer viable prior to the termination hearing. The court held a permanency hearing on December 11, 2018. Mother appeared at the hearing in person and through counsel. At the close of the hearing, the court filed a journal entry and order finding that the parents' progress toward reintegration was not adequate, that reintegration was no longer a viable option, and that either adoption or permanent custodianship might be in the best interests of the child. The court then ordered the State to file a motion to terminate parental rights.

As to Mother's argument that her engagement with the reintegration process was increasing, this ignores her actual level of participation with the tasks outlined in the reintegration plan. Mother reportedly completed parenting classes but did not provide

26

verification to her case manager that she had done so. Although Mother lived in the same home throughout the case, the case managers were never allowed inside to determine whether it was an appropriate residence for A.P. Mother did not provide documentation of any employment to KVC and only admitted that she worked at a temporary agency "[o]ff and on a couple of times." Mother completed two RADAC evaluations, but she never consistently followed through with any of the treatment recommendations and continued to use and test positive for methamphetamine. After not participating in any drug treatment since September 2018, Mother returned to treatment on May 13, 2019, two weeks before the termination hearing. While Mother submitted some negative UAs, she missed at least 73 of the 152 tests she was asked to take. Of the remaining tests Mother took, she tested positive 14 times and had 9 invalid tests. Mother did not submit any UAs from January 2019 until April 22, 2019, when she tested positive for methamphetamine at a court hearing. Mother's case manager tried to help Mother make progress on her case plan by reducing the frequency of her drug tests to once a week. Rather than progress, Mother cut off contact with her case manager and stopped showing up for the tests.

A district court may look to a parent's past conduct as an indicator of future behavior. See *In re Price*, 7 Kan. App. 2d at 483; *In re M.T.S.*, 2015 WL 2343435, at *8. The evidence at the termination hearing established that Mother had a long history of drug abuse that she failed to address with any meaningful treatment. Although Mother maintained short periods of sobriety that allowed her to participate in some visitation with A.P., she could not refrain from drug use and her ability to visit A.P. was suspended as a result. At the time of the May 2019 termination hearing, Mother had not visited A.P. for over four months and had not contacted her case manager for three months. Mother was discharged from drug treatment and continued to use drugs throughout the duration of the case, even knowing that her parental rights were at risk. Despite acknowledging that her drug usage was keeping her from A.P., Mother refused to admit that she had a drug problem or agree that any additional treatment would be beneficial.

Mother's past performance over the two years preceding the termination hearing shows that she was unwilling to address or even acknowledge her drug problem—the primary cause of her unfitness. Upon review of the evidentiary record, viewed in the light most favorable to the State, a reasonable fact-finder could find it highly probable that Mother was not going to make the necessary changes to become a fit parent in the foreseeable future.

3. *Best interests*

Finally, we consider the district court's finding that A.P.'s best interests would be served by terminating Mother's and Father's parental rights. The district court is in the best position to make findings on the best interests of the child, and we will not disturb its judgment unless we find the determination amounts to an abuse of judicial discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). Mother argues that in making its best interest determination, the district court focused only on its findings that the parents were unfit and that A.P. had been doing well in DCF custody. Noting that a finding of unfitness does not necessarily mean that termination is in a child's best interests, Mother contends there was little to no evidence from which the court could base a finding that termination is in A.P.'s best interests.

We are not persuaded by Mother's arguments. In reaching its decision, the district court noted that A.P. had spent her entire two years of life outside the parents' custody and she needed stability that Mother and Father were unwilling or unable to provide. The court found that despite numerous opportunities and accommodations provided by KVC and DCF, Mother and Father had failed to change their conduct or make any real effort to stop using drugs and to maintain consistent contact with A.P. Based on our review of the evidentiary record, a reasonable person could agree with the district court's conclusion, and we do not find that the district court's conclusion was based on any factual or legal

28

error. See *Northern Natural Gas Co.*, 296 Kan. at 935. We find no abuse of discretion here.

CONCLUSION

Having reviewed the entire record, in the light most favorable to the State, we are convinced that a rational fact-finder would have found it highly probable that Father is unfit. We are also convinced that a rational fact-finder would have found it highly probable that Mother's unfitness is unlikely to change in the foreseeable future. Finally, we find the district court did not abuse its discretion in finding that the termination of Mother's and Father's parental rights is in A.P.'s best interests. For these reasons, we affirm.

Affirmed.